**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CASSANDRA KOHL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-0975 |
| | § | |
| THE WOODLANDS FIRE | § | |
| DEPARTMENT | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Cassandra Kohl has sued her employer, The Woodlands Fire Department ("WFD"),

asserting violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.* Kohl worked

as the Fire and Life Safety Officer for the WFD for two years. She was paid a salary and was

not paid overtime. She alleges that the WFD violated the FLSA by classifying her as an

exempt administrative employee and failing to pay her overtime rates during the time she

worked as the Fire and Life Safety Officer. The parties conducted discovery and filed

opposing dispositive motions. The WFD moved for summary judgment on the basis that it

properly classified Kohl as an exempt administrative employee under section 213(a)(1) of

the FLSA. (Docket Entry No. 18). Kohl filed a motion for partial summary judgment on the

basis that she was not exempt from the FLSA's overtime pay requirements. (Docket Entry

No. 19). Kohl also filed a response to the WFD's summary judgment motion, arguing that

at a minimum there were disputed fact issues material to determining whether the FLSA

administrative employee exemption applied. (Docket Entry No. 22). The parties filed replies and surreplies. (Docket Entry Nos. 23, 24, 25, 26, 29).

Based on a careful review of the pleadings; the motions, responses, replies, and surreplies; the record; and the applicable law, this court denies the WFD's motion for summary judgment and denies Kohl's motion for partial summary judgment, finding the record inadequate to determine whether Kohl was properly classified as an exempt administrative employee. The reasons are discussed below.

## I.    Background

The WFD is a nonprofit Texas corporation located in Montgomery County, Texas. Its purpose is "combating residential and commercial fires, . . . educating the public about safety and fire prevention[,] providing health certification training to community residents[,] serving as a liaison between various safety organizations and citizens[,] and participating in civic activities for community enrichment purpose." (Docket Entry No. 18 at ¶ 7). Susan Welbes, the human resources director for the Woodlands Community Service Corporation, which provides human resources, finance, accounting, and general management support to the WFD, testified that the WFD is a service organization that provides fire protection and suppression, emergency medical services, fire prevention, and public education. (Docket Entry No. 22, Ex. A, Susan Welbes Dep., at 56).

In 2001, the WFD created the Fire and Life Safety Officer ("FLSO")[1] position to coordinate and oversee fire and life safety programs for the WFD. The duties had previously been performed by an employee who also performed inspections. (Docket Entry No.22, Ex. E, Cassandra Kohl Dep., at 81). The inspection and program coordination duties were split into two jobs. Kohl agreed in her deposition that her job as the FLSO was to "direct the public education effort that the [WFD] was making." (*Id.* at 17). This included teaching classes and giving lectures herself. It also included working on expanding the public education offerings that the WFD provided, finding additional programs in response to requests from the chiefs of the WFD or from members of the public. A third aspect of Kohl's job was to arrange for appearances by other WFD personnel and at classes or other community events. Kohl also appeared at various community events as a representative of the WFD. With one small exception, she supervised no employees and had no authority over other employees. The issue is whether her primary duties qualify her as an exempt administrative employee.

The record includes the job description for the FLSO position. It listed the job's essential duties and responsibilities, as follows:

> (1) Oversee, deliver, and coordinate fire and life safety programs (NFPA Risk Watch, Youth Firesetter Prevention Programs, Senior Fire and Life Safety Programs, Neighborhood Watch Programs, etc.)
>
> (2) Manage fire and life safety budget

---

[1] At times the position is titled the Fire and Life Safety Educator. Both titles refer to the position held by Cassandra Kohl between May 15, 2002 and June 30, 2004.

(3)  Work with Operation staff on coordination of Fire and Life Safety Programs

(4) Manage and deliver CPR and First Aid classes

(5) Participate in community events as required

(6) Participate in department's Emergency Operations Center

(7) Serve as Victim Assistance Liaison.

(Docket Entry No. 22, Ex. B).  The job description stated that the position required knowledge of fire and life safety education practices, EMS education practices, and program development, management, and evaluation.  The description also noted that the position required the ability to: work cooperatively with local departments and other governmental, social services, and private agencies; write clear and grammatical safety articles and reports; and communicate orally with employees, the general public, and representatives in one-on-one and group settings.  The job had no supervisory responsibilities.  The job required an associate of arts degree with experience that was similar to delivering public education programs for a fire department or working in school systems as an educator.  The reasoning ability required was to carry out "detailed but uninvolved written or oral instructions" and to "deal with problems involving a few concrete variables in standardized situations." Somewhat inconsistently, the work was described as "performed with considerable independence." (*Id.*).

Welbes, director of human resources for the Woodlands Community Service Corporation, reviewed the job description the WFD provided and determined that the

position should be designated as exempt for FLSA purposes. (Docket Entry No. 22, Ex. A,

Welbes Dep., at 13–14). She testified in her deposition that she based her decision on the

following factors:

> The fact that the position was going to coordinate and oversee
> fire and life safety programs, the fact that this position was
> going to use independent discretion and decision making as it
> pertains to the fire and life safety programs of The Woodlands
> Fire Department, and the fact that these programs went to the
> overall mission and vision of the fire department.

(*Id.* at 14–15). Welbes testified that she made the decision based on the job description and

did not later analyze the actual job duties Kohl performed to determine whether the

administrative exemption should apply.

The WFD announced that it was hiring for the FLSO position in the spring of 2002.

Kohl applied for and received the promotion to the FLSO position. Kohl was told from the

outset that her new position would be salaried and exempt from the FLSA overtime pay

requirements. (Docket Entry No. 18, Ex. A-1; Docket Entry No. 22, Ex. E, Kohl Dep., at

120–23). Kohl began working in the FLSO position on May 15, 2002 and remained in that

position until June 30, 2004, when she was demoted to her former position as a firefighter.

As the FLSO, Kohl was paid a beginning salary of $43,237.38. After merit bonuses, she

received $45,421.25. (Docket Entry No. 22, Ex. A, Welbes Dep., at 12). Kohl alleges that

she worked extensive overtime hours while serving as the FLSO, for which she was not

compensated at overtime rates because of her classification as an exempt administrative

employee.

As noted, Kohl testified that her job as fire and life safety officer was to direct the

public education effort that the fire department was making. (Docket Entry No. 22, Ex. E,

Kohl Dep., at 17). She summarized the types of work her job included:

> I coordinated programs. I pulled in programs and wrote them. I had a budget
> that I followed. Bought materials. Went out and lectured.

(*Id.* at 7). Kohl expanded that testimony:

Q.   So the first part of your job is selecting which programs your
department is going to sponsor or teach; is that right?

A.   No. I mean, I went out and evaluated the jobs, and then I had to go and
give them the information I had to go any further, and then I would get
the clarification to go any further if they wanted that or not.

Q.   So you evaluated a program or a training session or something, you
then made a recommendation to the fire department, yes, I think this is
a good program or no, I think it's a bad program; is that correct? Is that
what you're saying?

A.   Correct.

Q.   And then based on that recommendation, the fire department would
make a decision, yes, we're going to incorporate that into what we're
doing, or if you recommend no, then they'd say no, we're not going to
do that?

A.   Then we'd go further if they liked the program.

Q.   So in that respect, part of your job was to exercise your discretion as to
the content of these programs and decide which ones you would
recommend and which ones you would not recommend; is that correct?

A.   I guess that would be true.

Q.   And then if I'm understanding you – and I want to be sure that I am –
then once a program was decided upon, also part of your responsibility

would be to write it up or modify it or do something to it so that it could be taught appropriately to whatever audiences the department was going to go out and present the program to. Is that also part of your job?

A.    Yes.

(*Id.* at 9–10).

When Kohl was hired, the WFD had only a few fire and life safety programs: a Risk Watch Program, a fourth-grade program, and a program to instruct on the use of fire extinguishers. (*Id.* at 87). Kohl was asked to improve the implementation of these programs and to add new programs. She testified that many of the ideas for new programs were brought to her by the WFD chiefs and that some ideas originated with a request from someone in the Woodlands Community. (*Id.* at 35). Kohl's responsibility was to research whether there were publicly available programs responsive to the requests and to evaluate the programs she found to decide whether to recommend that they be added to the WFD curriculum. Once Kohl had researched and located an existing publicly available program, she would evaluate it and recommend to the WFD management whether to add the program to the WFD curriculum. If the recommendation was accepted, she would "write [the program] down in an educational form which other people can follow." (*Id.* at 9). Kohl testified that she would recommend whether a program should be included in the curriculum, but did not make the final decision. (*Id.* at 35–36). Once the decision was made to include the program, she would modify the materials as needed for teaching to a particular audience, although she stated that there was not a "whole lot of modification to do." (*Id.* at 37).

The programs Kohl added to or expanded included school programs relating to exit drills, evacuations, drug overdoses, and arson. Kohl also responded to a request from a business in the Woodlands Community, located a program to teach evacuation from high-rise or multistory buildings and developing evacuation plans, and recommended it to her management. The program was approved and she implemented it, although it was discontinued after a period. (*id.* at 44–45). Kohl added a program about the proper installation of car seats and how to check whether they were properly installed, (*id.* at 71–73), and a program about safety practices for baby sitters, (*Id.* at 75–78). She also responded to a request for fire safety programs for elderly people, locating and recommending to the WFD that it should present programs instructing individuals in assisted-living facilities on what they should do in a fire scene. (*Id.* at 87–88).

Once a program was approved, Kohl purchased the materials necessary for the approved programs, within a preset budget she was provided. Kohl worked within a defined budget set by her supervisors. (*Id.* at 12–15). Kohl testified that early in her tenure, her budgetary decisions were closely monitored, but over time she was given "some leeway." (*Id.*). Working within the budget, she would purchase "materials and supplies or whatever [she] thought was necessary to carry out the functions of the fire and life safety officer." (*Id.* at 11–12). Welbes similarly testified that Kohl was given some latitude in her financial decisions and that she needed permission only if the implementation of a program "exceeded [Kohl's] signature authority that was allowed to spend or if it would take significant

resources, either time or individuals []." (Docket Entry No. 22. Ex. A, Welbes Dep., at 60).

If she exceeded a certain dollar limit, she had to get specific authority to make purchases.

She had no authority to, or involvement in, the creation of the budget, and no authority to

change it. (*Id.* at 59–61).

When organizations such as schools, day care centers, geriatric centers, church groups,

or businesses asked the WFD for educational programs on fire and life safety, it was Kohl's

job to respond to the requests. Part of that job was to be sure that the classes and lectures the

programs required were delivered to the right group at the right time. Kohl did not teach all

the classes or give all the lectures, but she testified that she personally taught and gave many

of them herself. Kohl also scheduled lectures and classes given by other WFD members.

The administrative assistant to the chief did part of this work, although Kohl scheduled all

of the CPR classes. Kohl testified that she had the authority to direct her own attendance at

a scheduled event, but she could not order other members of the WFD to attend an event.

(Docket Entry No. 22, Ex. E, Kohl Dep., at16–18, 20). Kohl had no supervisory authority

over other members of the WFD, but she did have the authority to respond to requests for

appearances by WFD personnel or equipment by scheduling specific events. (*Id.* at 23).

Certain events, such as parades, required supervisory approval, but Kohl was authorized to

respond to requests from the community for most appearances by the WFD and to schedule

those appearances. (*Id.* at 28).

A related part of Kohl's job concerned the CPR classes the WFS provided. The WFD was a certified CPR training center, and Kohl coordinated the center. She scheduled CPR classes and, with contract personnel, taught CPR classes. (Docket Entry No. 22, Ex. E, Kohl Dep., at 52–53, 55). Her responsibilities in this role included scheduling CPR classes, scheduling the contract instructors for the classes, and evaluating the CPR instructors. (*Id.*). Although she had no general supervisory authority, it was part of her job to evaluate the CPR instructors. During the two years of her tenure, she was critical of two of the instructors and recommended that they no longer teach the CPR classes. One of the instructors was placed on probation, but Kohl's personnel suggestions were not otherwise implemented. (*Id.* at 56–60).

Kohl also attended public and community events on behalf of the WFD. These ranged from events such as Earth Day observances to various community fairs or festivals. At these events, Kohl would hand out brochures. At some of these events, Kohl would also provide services, such as registering bicycles and checking car seats. (*Id.* at 60–63). Kohl testified that her presence at such events was in part public relations – to generate goodwill for the fire department – to provide some educational services, and to let people know what other classes and fire safety presentations WFD offered. (*Id.*). She did not, however, have a general responsibility to represent the WFD other than to hand out brochures, deliver prepared lectures, classes, or programs, or answer questions about the WFD's educational offerings.

10

The WFD put a victim's assistance program into place when Kohl became the fire and life safety officer, and she became the victim's assistance liaison, counseling people who had suffered fires and giving advice and information on financial help and social services that were available. (*Id.* at 111). It is undisputed, however, that Kohl spent a very small amount of her time in this role. (Docket Entry No. 22, Ex. A, Welbes Dep., at 6–7). The job description also identified work in the WFD's Emergency Operations Center, but the Center is only deployed in times of emergency and it appears that Kohl did not participate in it as the Fire and Life Safety Officer. (*Id.* at 34).

Kohl received a job evaluation signed in early 2003. The evaluation covered her knowledge of fire, life, and safety education; ability to communicate well with internal and external customers; ability to write reports, safety articles and reports and procedure manuals; ability to present information effectively and respond to questions from groups of customers and the general public; ability to define problems, collect data, establish facts, and draw valid conclusions; and knowledge of program development, management and evaluation. (Docket Entry No. 18, Ex. A-3). Kohl was rated poorly in the area of verbal and written communication skills. Her "performance contract" identified the following key objectives and assignments: "1) revise & monitor school fire prev. program; 2) continue to oversee CPR/1st Aid education program; 3) expand fire prev./life safety ed to area assisted living facilities/high risk occupants; 4) work w/ fire chiefs assistant to improve comm. between WFD & community." (Docket Entry No. 18, Ex. A-3 at 6).

11

On June 30, 2004, Kohl was demoted to firefighter.  She filed this lawsuit on March 22, 2005, alleging that the WFD improperly had classified her FLSO position administratively under the FLSA's exemption for administrative employees.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics*

*Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

**B.     The FLSA**

Section 207(a) of the FLSA requires covered employers to compensate nonexempt employees at overtime rates for time worked in excess of statutorily defined hours. 29 U.S.C. § 207(a). Section 216(b) creates a cause of action for employees against employers violating the overtime compensation requirements. It provides, in relevant part:

> An action . . . may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).

Section 13(a)(1) of the FLSA exempts employees occupying "bona fide executive, administrative, or professional" positions from the overtime requirements of section 207. 29 U.S.C. § 213(a)(1). These terms "are [to be] defined and delimited from time to time by regulations of the Secretary [of Labor]." *Id.* New regulations were put into place in August 2004. "Under [the old regulations], the Secretary of Labor . . . defined the terms executive, administrative, and professional, by setting out 'long' tests for employees earning more than $155 per week but less than $250 per week, and 'short' tests for employees earning more than $250 per week." *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000) (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990)); *see also* 29 C.F.R. § 541.2(a)-(e) (2001); 29 C.F.R. § 541.214 (2001). Both parties agree that the short test, which applies to "high salaried administrative employees," 29 C.F.R. § 541.214, applies. *See Lott*, 203 F.3d at 331.[2]

Under the "short" test, an exempt administrator must primarily perform (1) office or nonmanual work, (2) that is directly related to management policies or general business

---

[2] Under the new exemption, employees earning in excess of $100,000 per year are exempt from the overtime pay requirement as long as they "customarily and regularly" perform "any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. 601.

The new regulations were not expressly made retroactive. *See* 69 Fed. Reg. 22122-01, 22122 (Apr. 23, 2004). Federal courts have held that the new regulations do not apply retroactively. *See, e.g., Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005); *Tiffey v. Speck Enters., Ltd.*, 418 F. Supp. 2d 1120, 1124 n.3 (S.D. Iowa 2006); *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1148 n.2 (D. Minn. 2005). The Fifth Circuit has refused to apply other FLSA statutory – not regulatory – amendments that were not expressly made retroactive. *See Vela v. City of Houston*, 276 F.3d 659, 674 (5th Cir. 2001). Because Kohl's employment as the FLSO ended on June 30, 2004, before the new regulations went into effect, the pre-2004 regulations apply. Because the new relevant regulations are not inconsistent with the old, but clarify the application, they are also usefully consulted.

operations for the employer or the employer's customers, and (3) involves the exercise of discretion and independent judgment. 29 C.F.R. §§ 541.2(e)(2) (superceded); 541.2(e)(1) (superceded).  The first question is whether the employee's primary work duty is directly related to management policies or general business operations.  Section 541.205(a) defines the "directly related" element by distinguishing between what it calls "the administrative operations of a business" and "production."  Administrative operations include such duties as "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control."  *Id.* § 541.205(b).  "Directly related" administrative work is of "substantial importance" to the business operations of the enterprise in that it involves "major assignments in conducting the operations of the business, or . . . affects business operations to a substantial degree."  *Id.* § 205(c).  Examples of employees in administrative positions include buyers in industrial plants and retail establishments; personnel analysts; and advisory specialists and consultants such as credit managers, safety directors, claims agents and adjustors, wage-rate analysts, tax experts, account executives at advertising agencies, stock brokers, and promotion people.  *See* 29 C.F.R. § 541.205(c)(1)-(c)(5).

The first issue is to determine the employee's primary duties.  "[I]t may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103.  However, time alone, is not the sole test.  *Id.*  A job duty that is of principal importance to the employer, or other duties that are collateral to that

job duty, may be considered a primary duty even though it occupies less than 50 percent of the employee's time. *Dalheim v. KDFW-TV*, 98 F.2d 1220, 1224 (5th Cir. 1990); *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 401 (6th Cir. 2004) (citation omitted). The actual day-to-day job activities of the employee are relevant to determining whether employees are exempt administrative employees under the FLSA, not the labels the employee or the employer place on those duties. *See, e.g., Tyler v. Union Oil Co. of Calif.*, 304 F.3d 379, 404 (5th Cir. 2002); *Schaefer*, 358 F.3d at 400. In determining what an employee's day-to-day job activities are, general job descriptions contained in an employee's resume or prepared by the employer may be considered, but are not determinative, and descriptions contained in depositions and affidavits should be considered as well. *See Schaefer*, 358 F.3d at 400–01.

In determining whether an employee's primary work duty is directly related to management policies or general business operations, the question is whether the types of activities the employee is engaged in relate to the administrative operations of the business as distinguished from production or sales. The regulations do not set up a dichotomy under which all work must either be classified as production or administrative. Rather, the regulations distinguish production work from the administrative operations of the business at 29 C.F.R. § 541.205(a) – production work cannot be administrative – and define the administrative operations of the business at 29 C.F.R. § 541.205(b). Courts have struggled to apply the distinction between administration and production, while acknowledging that the distinction is clearly set out in the regulations. The traditional model of production work

16

is factory manufacturing or assembly-line work, but the regulations clearly are not limited to such settings. *See, e.g., Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3rd Cir. 1991). Courts analogize from the factory setting to other work settings.

In *Dalheim*, 918 F.2d 1220, the court held that television news producers, directors, and assignment editors were not exempt as administrators because their duties clearly related to the production of the news department's stories, not to its administrative operations. In *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1 (1st Cir. 1997), the Secretary of Labor sought to enjoin the John Alden Life Insurance Company from violating FLSA's overtime requirements. The Secretary argued that John Alden's marketing representatives were not exempt administrative employees because they were engaged in "production" rather than "administrative" activities. *Id.* at 3. The district court ruled in favor of John Alden, and the First Circuit agreed. The parties in *Reich* had stipulated that the product produced by the employer, a life insurance company, was life insurance policies. Because the marketing representatives were not involved in the design or generation of the policies, they could not be considered "production" employees and were therefore exempt. *Id.* at 9. The court also found that the day-to-day activities of the marketing representatives included keeping agents informed of changes in the product and pricing structures, advising agents on which policies should be marketed against competing products, and helping agents put together proposals to bid on new business. *Id.* at 10. These activities were more in the nature of "representing the company" and "promoting sales" of the company's products, ancillary to the production

17

of life insurance policies, and corresponded to examples of exempt administrative work provided by 29 C.F.R. § 541.205(b). *Id.* The marketing agents were engaged in "something more than routine selling efforts. . . ." *Id.* (quotations omitted). Rather, their agent contacts are "aimed at promoting ... customer sales generally," activity deemed administrative sales promotion work under section 541.205(b). *Id.* (citations omitted).

The *Reich* court distinguished the Third Circuit's decision in *Martin v. Cooper Electric Supply Company*, 940 F.2d 896 (3d Cir. 1991), in which the court found that the salespeople for an electrical parts wholesaler were nonexempt because they were "production" employees. *Reich*, 126 F.3d at 9–10. Because the company's primary purpose in *Cooper* was to produce sales of electrical products, the salespeople were engaged in generating the very product that the company existed to market – the sales of electrical products. The court explained that in *Reich*, by contrast, the insurance company actually produced a product of its own – insurance policies – and did not exist merely to produce sales. Consistent with the "servicing" component of the interpretive regulations, *see* 29 C.F.R. § 541.205(b), the *Reich* court agreed with the Third Circuit's explanation that "servicing a business" entails "employment activity ancillary to an employer's principal production activity." *Id.* at 10 (citing *Cooper Electric*, 940 F.2d at 904). The issue is not whether an employee worked for an enterprise engaged in production activity, but whether the employee's primary duty was producing the product in question.

The analytic difficulty of applying the "production/administration" distinction has led some courts to question whether the dichotomy is analytically helpful in the context of modern service industries and to emphasize that the analogy applies in a particular case only to the extent that it "elucidates the phrase 'work directly related to the management policies or general business operations.'" *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1126 (9th Cir. 2002); *see also Shaw v. Prentice Hall Computer Publ'g, Inc.*, 151 F.3d 640, 644 (7th Cir. 1998). The revised 2004 Department of Labor regulations have moved away from this dichotomy in the context of service industries. "Only when work falls 'squarely on the "production" side of the line,' has the administration/production dichotomy been determinative." *Bothell*, 299 F.3d at 1127 (citing *Reich*, 3 F.3d at 587–88; *Cooper*, 940 F.2d at 904–05; *Shockley v. Newport News*, 997 F.2d 18, 29 (4th Cir. 1993)). This approach has been adopted under the new DOL regulations. *See Edwards v. Audubon Ins. Group*, No. 02-1518, 2004 WL 3119911, at *5 (S.D. Miss. Aug. 31, 2004).[3]

---

[3] The 2004 revisions of 29 C.F.R. § 541.201 state:

(a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

(b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee

The administrative exemption is further limited to employees who perform work of "substantial importance to management or operations." 29 C.F.R. § 541.205 (superceded). The issue is whether the employee directly or indirectly formulates, affects, executes, or carries out management policies by, for example, undertaking major assignments in conducting the operation of the business or performing work that affects business operations to a substantial degree, even if related only to the operation of a particular segment of the business. *Id.* Work need not involve the formulation of management policies or the operation of a business as a whole, however, in order to qualify as work of "substantial importance." *Id.* Employees whose work is "directly related" to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. *Id.* The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects the business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business. *Id.*

---

benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

(c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201.

Examples of such employees include those holding positions in personnel administration, labor relations, and research and planning, as well as those who provide assistance to management officials in carrying out their executive or administrative functions. *See id.*; *see also Cooper Electric*, 940 F.2d at 902, 906 (holding that an administratively exempt employee must be directly or indirectly involved in the determination, administration, or implementation of the employer's management or operational policies).

The third aspect of the "short test" for the administrative exemption requires that the exempt employee exercise "discretion and independent judgment" in her work. Discretion and independent judgment must be "real and substantial," that is, they must be exercised with respect to matters of consequence. 29 C.F.R. § 541.207(d)(1). The exercise of independent judgment involves "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 U.S.C. § 541.207(a). An employee who exercises independent judgment "has the authority or power to make an independent choice, free from immediate direction or supervision." *Id.*

The term "discretion and independent judgment" as used in the regulations "does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R. § 541.207(e). Indeed, the decisions made by the employee may merely lead to recommendations for further action. *See id.* The fact that an employee's decisions are subject to review, and that they may on

21

occasion be reversed, or the recommendations rejected, "does not mean that the employee is not exercising discretion and independent judgment." *Id.*

The interpretive regulations emphasize that employees who follow prescribed procedures, or who determine whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, are not exercising discretion and independent judgment. *See* 29 C.F.R. § 541.207(c)(1). Nonexempt employees include inspectors or examiners such as graders of lumber or insurance appraisers, who rely on techniques and skills acquired through training and experience, but who basically perform work along standardized lines involving well-established techniques and procedures. *See Id.* § 541.207(c)(2)–(4). Other examples include personnel clerks who screen job applicants based on their conformity with specific qualifications established by the employer, as contrasted with personnel officers who make hiring decisions or recommendations, or computer programmers as contrasted with keypunch operators or programmer trainees. *See Id.* § 541.207(c)(5), (7).

The employer bears the burden of proving that its employee is exempt, and the provisions of the exemption must be narrowly construed against the employer. *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004); *Bondy v. City of Dallas*, No. 03-10112, 77 Fed. Appx. 731, 732 (5th Cir. Oct. 9, 2003).

### III.   Analysis

Although the parties have stated that there are no genuine issues of material fact as to Kohl's job duties, (Docket Entry No. 18 at 1; Docket Entry No. 19 at 12), they vigorously dispute whether given these duties, Kohl should have been classified as an exempt administrative employee.  The parties agree that Kohl's duties were nonmanual office duties. The inquiry is whether there are meaningful disputes about what her primary duties were, whether they directly related to the WFD's management policies or general business operations, and whether they involved the exercise of discretion and independent judgment. *See Dalheim*, 918 F.2d at 1226.

### A.   Kohl's Primary Duties

Kohl testified that the "majority of her job was to educate." (Docket Entry No. 22, Ex. E, Kohl Dep., at 32).  In both her motion for partial summary judgment and her response to the WFD's summary judgment motion, Kohl argues that because the WFD has admitted that public education is a commodity or service that it provides, and because Kohl's primary duty was to provide that service, Kohl produced the service that constitutes the WFD's marketplace offering, rather than contributing to running the business itself. *See Dalheim*, 918 F.2d at 1230.  Although Kohl was clearly not involved in what would at first glance appear to be the WFD's primary service – firefighting – the WFD has identified that its services include public fire and life safety education. (Docket Entry No. 18 at ¶ 7; Docket Entry No. 22, Ex. A, Susan Welbes Dep., at 56).

23

Kohl's summary description of her duties as "education" does not clarify what her primary duties are or even what she spent most of her time doing. It is clear from the job description and from Kohl's extensive deposition testimony that "education" included a number of related but distinct duties. Kohl personally delivered lectures and classes in schools, commercial establishments, nursing homes, and in the CPR program. (Docket Entry No. 22, Ex. E, Kohl Dep., at 17, 42–44, 52–53). Other WFD personnel also gave lectures and classes, delivered programs, and were regularly assigned to the CPR program. (*Id.* at 42–44, 52–53). There was, however, only one Fire and Life Safety Officer. What set that officer apart from others who also gave classes and lectures, delivered programs, and were assigned to the CPR program, were the duties involving the coordination and direction of the WFD fire and life safety offerings.

Neither party provides a breakdown of the time Kohl spent personally teaching and lecturing, on other aspects of developing, coordinating, and directing the WFD fire and life safety program, and on representing the WFD in various community events. Kohl simply characterizes all of her duties as related to "education." The WFD provides a breakdown of the amount of time Kohl spent on different programs, but it does not distinguish between her work in delivering these programs by teaching the classes or giving the lectures, and her work in putting the programs together and coordinating them.

Under § 541.103, "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time[,] time alone

. . . is not the sole test." *Dalheim*,  918 F.2d at 1227 (quoting 29 C.F.R. § 541.103 (superceded)).  "An employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work." *Id.*; *see also Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 326 (5th Cir. 2000).  Exempt work may be an employee's primary duty even though such work occupies less than half her time "if the other pertinent factors support such a conclusion." *Dalheim*, 918 F.2d at 1227; *Smith v. City of Jackson*, 954 F.2d 296, 299 (5th Cir. 1992).  In general, the employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim*, 918 F.2d at 1227.  In *Lott*, the Fifth Circuit held that "even assuming that the majority of [the employee's] time was not spent on [management activities], such a finding does not preclude the determination that [the employee's] primary duties consisted of the administration of the general business operations of [the employer], such that the administrative and supervisory duties performed . . . were of principal importance[,] . . . as opposed to those collateral tasks which may have taken more than fifty percent of her time." *Lott*, 203 F.3d at 332 (citations omitted).  In that case, although Lott spent the majority of her time engaging in nonexempt activities, the combination of her administrative and clerical duties led the court to find that she was an exempt administrative employee. *Id.*

In this case, the record does not permit a determination as to whether Kohl's primary duties were to arrange for new or expanded WFD programs; scheduling the presentation of the WFD programs in a variety of venues in the Woodlands Community; teaching a number of the programs and classes herself; or attending various community events on behalf of the WFD. It would appear from the record that Kohl's primary duties were those specific to the newly created position of the Fire and Life Safety Officer, unlike the duties of teaching classes or delivering lectures that were shared by others. Kohl testified that one of the reasons she was hired was to expand the number of programs that the WFD offered, as well as improve the quality of the programs. Although Kohl spends a great deal of her brief arguing that her job duties did not include that of "community liaison" because those words were not used in the job description, Kohl testified that when she attended different events, fairs, and other community functions on behalf of the WFD, part of the reason she was there was public relations. (Docket Entry No. 22, Ex. E, Kohl Dep., at 60–63). Kohl's job evaluation makes it clear that her duties included improving communications between the WFD and the community. (Docket Entry No. 18, Ex. A-3 at 6).

The record is also unclear as to whether the duties of principal value to the WFD were the work Kohl did to locate and add preexisting programs to the WFD curriculum of fire and life safety classes; to purchase materials to put on these programs; to schedule the programs; to teach the classes or present the programs herself; or to appear at various community events on behalf of the WFD. The record does not show how much time Kohl spent on the various

components of her job.  There is no evidence from her supervisors or from anyone except herself about what duties she actually did in her job or how valuable different duties were to her employer.  As a result, it is unclear on the present record what her primary duties were.

### B.      Directly Related to Management Policies or General Business Operations

The WFD must show that Kohl's primary duties were "the performance of office or nonmanual work directly related to the management policies or general business operations of the employer or the employer's customers." 20 C.F.R. § 541.2(a)(1) (superceded).  Such duties include "those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work." *Id.* § 541.205(a) (superceded).  The regulations state that the phrase limits the exemption to "persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers."  *Id.*  The regulations clarify that the phrase "directly related to management policies or general business operations" is not limited to those employees who "participate in the formulation of management policies or in the operation of the business as a whole." *Id.* § 541.205(c) (superceded).  The regulations describe the "administrative operations" of a business as including the "work performed by so-called white collar employees engaged in 'servicing' a business as, for example, advising management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control."*Id.* § 541.205(b) (superceded).

The parties dispute whether Kohl's admittedly nonmanual work was directly related to the WFD's management policies or general business operations, as the WFD contends, or to the services that the WFD produced, as Kohl contends. As noted, it is unclear whether Kohl's primary duties were researching, evaluating, and making recommendations about what safety programs to incorporate into the WFD's curriculum; implementing approved programs; responding to requests for programs from the public and scheduling the delivery of classes and programs; teaching classes herself; or representing the WFD at community events.

Kohl's argument that "servicing the community or being a community resource by educating the community in fire and life safety programs was a commodity or service the WFD was organized to provide," and that Kohl's primary duties were to educate the community through fire and life safety programs, (Docket Entry No. 22 at 11), proves too much. Although the WFD has stated that one of its purposes is to provide fire and life safety education, it did not state, and the record does not show, that the WFD was in the business of creating or modifying classes, lectures, or programs on fire and life safety. Rather, the record shows that the relevant commodity or product the WFD delivered was the presentation of prepared and scripted classes, lectures, or programs. To the extent that Kohl taught prepackaged classes, delivered preset lectures, or presented preestablished programs, she was not engaged in administrative work, but rather in producing one of the services the WFD provided. But to the extent Kohl was evaluating different publicly available programs to see

if they responded to needs identified by requests from her chief or members of the Woodlands Community, making recommendations as to whether the programs should be added to the WFD curriculum, and modifying the approved programs to make them fit the curriculum, she was not engaged in "production" work. To the extent Kohl was representing the WFD in various community events at which she informed the public about what educational programs the WFD could offer, she was not engaged in "production" work. These responsibilities did not end when the specific class she gave, or the lecture she delivered, ended, as was the case with the news producers in *Dalheim*, 918 F.2d 1220. Rather, her work consisted of advising management on developing the programs, coordinating the programs, and, through her appearances at public events, promoting the programs. These are the types of administrative tasks noted in 29 C.F.R. § 541.205(b).

Cases also suggest that such work falls in the administrative rather than the production category. *See Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512 (6th Cir. 2004) (holding that, when employer's principal production activity was generating electricity in a nuclear plant, employees who created plans for maintaining equipment and systems in the plant were ancillary to the principal production activity and formed the type of "servicing" that the FLSA deems administrative work directly related to general business operations); *Reich*, 126 F.3d at 9 (holding that marketing representatives were exempt because the employer's products were the insurance policies themselves, which the representatives did not create or generate); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1003 (8th Cir.

2003) (holding that an insurance claims coordinator was an administrative employee exempt from FLSA requirements); *Bratt v. County of Los Angeles*, 912 F.2d 1066 (9th Cir. 1990) (holding that deputy probation officers employed by County were not exempt because they conducted factual investigations and provided information used in the court's day-to-day production process, not information on the proper way to conduct the business of the court); *Bates v. United States*, 51 Fed. Cl. 460, 462–63 (Fed. Cl. 2002) (holding that Assistant Chief Patrol Agents at the United States Border Patrol Academy were exempt because they played a substantial role in the development of Academy curriculum and maintenance of its facilities, formulated and executed management programs and policies, and were involved in providing training for incoming border patrol agents); *Copas v. E. Bay Mun. Util. Dist.*, 61 F. Supp.2d 1017, 1021 (N.D. Cal. 1999) (concluding that public relations officer was exempt because her duties related to community outreach and public information functions, which are part of general business operations).

Even assuming that Kohl's primary duties were not productions duties, the record is inadequate to determine whether such nonproduction duties directly related to the WFD's management policy or to its general business operations. The case law makes it clear that although production work cannot be administrative, it is not the case that nonproduction work must be administrative. *See Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004) (stating that the regulations do not set up an absolute dichotomy under which all work must either be classified as production or administrative, but distinguish production work

from the administrative operations of the business at 29 C.F.R. § 541.205(a) and then go on to define the administrative operations of the business at 29 C.F.R. § 541.205(b)).  It would appear that activities such as advising management about what offerings to add to the WFD curriculum of fire and life safety classes, coordinating and scheduling the delivery of classes, and appearing at community events to promote the curriculum, would be in the category of administrative work recognized by the regulations.  *See* 29 C.F.R. § 541.205(b)(listing advising management, representing the company, and business research as "administrative" in nature).  However, unless these were Kohl's primary duties, the exemption does not apply.

The parties spend a great deal of time and a number of pages attempting to distinguish various cases and other precedents.  Analyzing exempt status under the FLSA is intensely fact-specific.  *See Schaefer*, 358 F.3d at 400–01; *Ale v. Tenn. Valley Authority*, 269 F.3d 680, 688–89 (6th Cir. 2001); *Roberts v. Nat'l Autotech, Inc.*, 192 F. Supp. 2d 672, 677 (N.D. Tex. 2002).  Kohl emphasizes opinion letters from the Department of Labor that she asserts are "more on point" than the cases the WFD cites.  The opinion letters are not particularly helpful. One letter addresses whether the safety director of a city's electricity department was exempt. The employee's duties were to investigate accidents, investigate power diversions, and operate the meter reading section.  The letter also notes that the safety director administered energy programs and marketing programs.  Noting that the information provided was not enough for a definitive determination, the Department of Labor stated that the making of investigations, the keeping of records, and the handling of customer complaints were not administrative

31

work. The letter did not address any of the other duties of the employee – the duties similar to parts of Kohl's job – or explain which duties were primary and which were not. (Docket Entry No. 22, Ex. F, U.S. Dep't of Labor Op. Ltr., 1992 WL 845086 (Mar. 16, 1992)).

Kohl also cites a DOL opinion letter dealing with a fire district's training and safety officer. The officer was expected to perform basic firefighting, rescue, and emergency medical services, as well as fire inspection and training. The department stated that this position did not qualify as administrative, noting that generally a firefighter who also trains fellow firefighters is not an exempt administrative employee. (*Id.*, Ex. G, U.S. Dep't of Labor Op. Ltr., 1992 WL 845098 (Aug. 20, 1992)). In the present case, Kohl's duties went far beyond training firefighters, and she was not required to participate in regular firefighting duties. Finally, Kohl cites a third letter, involving the status of fire prevention inspectors. These employees inspected buildings to enforce fire prevention laws, managed and administered public relations and educational efforts for public fire prevention and safety for the city, and also responded to fires and performed firefighting duties. The letter concluded that the employees' primary duties were to inspect buildings to enforce fire safety standards, determine the cause of fires, and respond to fires and perform the duties of a firefighter. The letter implicitly found that the employees' primary duties did not include educational efforts or community involvement. In this case, by contrast, Kohl's duties were not firefighting or its related duties, such as building inspection. (*Id.*, Ex. H, U.S. Dep't of Labor Op. Ltr., 1992

WL 845084 (Mar. 3, 1992)). These letters are not helpful to determining where on the production-administrative continuum Kohl's duties fall.

### C . Of Substantial Importance to Management or Operations

If Kohl's primary duties were to improve the content, coordination, and delivery of the fire and life safety curriculum for the WFD, the record shows that such work was of substantial importance to the WFD because her work affected, executed, and carried out a management policy that Kohl identified in her deposition – improving the quality and quantity of the WFD public safety offerings – and the WFD's general business operations as it related to providing fire and life safety programs for the Woodlands Community. Kohl engaged in research and planning for new and existing fire and life safety classes, lectures, and programs, and advised her chiefs as to how they could expand the WFD curriculum using publicly available programs. Engaging in research and planning, and providing assistance to management officials in carrying out their functions, are examples of the duties of employees performing work of substantial importance. 29 C.F.R. § 541.205(c); *see also Dalheim*, 918 F.2d at 1230; *Reich*, 126 F.3d at 9; *Piscione*, 171 F.3d at 540. The record is unclear, however, as to what were Kohl's primary duties and there is scant evidence in the record as to the relative importance of those duties to the WFD.

### D. Exercising "Direction and Independent Judgment"

Last, the WFD must show that the undisputed facts demonstrate that Kohl's primary duties involve the exercise of discretion and independent judgment. Discretion and

33

independent judgment involve the "comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered . . . . [It] implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207.

Kohl's deposition testimony is at times unclear, but it appears that she exercised discretion in some aspects of her job duties and not in others. Although the regulations require exempt administrative employees to exercise discretion and independent judgment "customarily and regularly," this must be "greater than occasional" but may be "less than constant. 29 C.F.R. § 541.207(g).

Kohl testified that she did not originate programs, but clarified that although the ideas for new programs usually originated with her chiefs or from people in the community who made requests or identified problems and needs, she took the steps necessary to locate, evaluate, recommend, and implement programs that could be delivered to the Woodlands Community by the WFD, using materials that were already available in the public. Kohl testified as follows:

> Q.    Was there ever a time when you came up with the idea for a new program?
>
> A.    I'm sure within that time period I might have come up with lots of ideas.
>
> Q.    Can you remember any of them?
>
> A.    That came out of nothing?

Q.    Well, I don't know if they came out of nothing, but where you came up with the idea. you said you came up with lots of the ideas; is that true? Did you?

A.    From questions from the public.

Q.    Regardless of where they came from, Ms. Kohl, you've said –

A.    I mean, if it's not there and we designed a program, obviously, you know, I came up with something.

Q.    Well, that's all I'm trying to ask you, is to tell us what you did. Did you come up with programs?

A.    Yes.

Q.    Tell us some of the programs you came up with.

A.    We developed – when I walked in there, we did four programs. They had one program – a one-page program for the Risk Watch program for one, the fourth grade, and then the fire extinguisher program. That's it. That's all they had. And within that time period, I developed programs from – or found programs, brought them in. Did I handwrite every program? No, but I found programs that were already out there and brought them into the fire department, multi, incorporated them into it.

Q.    There were many programs that you did that with, right?

A.    All the programs that we – well, they don't have them anymore, but they did.

Q.    How many programs did you implement, do you think? What's your best recollection?

A.    We taught from pre-k up to high school, so there's 12, 13 programs right there. We did, I believe, five different commercial programs. We did a baby-sitters program. We did the car seat program. We worked with the elderly.

(Docket Entry No. 22, Ex. E, Kohl Dep., at 86–87).

Kohl exercised discretion in researching whether a particular preexisting program responded to her chief's instruction or a request from the community, in evaluating the publicly available program, and in determining whether to recommend the program to her supervisors for inclusion in the WFD curriculum. Kohl's argument that she did not exercise final authority is not dispositive. To satisfy the discretionary element, it is unnecessary that an employee have the "[f]inal decision making authority over [the] matters of consequence." *Lott*, 203 F.3d at 331 (citing *Reich*, 126 F.3d at 13; *Dymond v. U.S. Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982)). "'Even though an employee's work is subject to approval, even to the extent that a decision may be reversed by higher level management, it does not follow that the work did not require the exercise of discretion and independent judgment.'" *Reich*, 126 F.3d at 13 (quoting *Dymond*, 670 F.2d at 96). "While the regulations require the employee to exercise independent judgment, the term does not require this judgment to be made in isolation." *Piscione*, 171 F.3d at 535 (emphasis removed). The fact that others may review or even reverse an employee's judgment does not mean necessarily that the employee will fall outside the FLSA's administrative exemption. *Id.*

Kohl also exercised some discretion in customizing the program for the intended audiences, although her testimony is inconsistent and unclear as to the extent or nature of the customization involved. (Docket Entry No. 22, Ex. E, Kohl Dep., at 8–9). The extent to which Kohl exercised discretion in executing the educational programs is unclear. (Docket

Entry No. 22, Ex. A, Welbes Dep., at 60–61). Once a program was approved, little discretion appeared to be required to respond to a request for a program and arrange for its delivery.

Kohl's work delivering preexisting programs and classes does not appear to involve discretion. *See Ale v. Tenn. Valley Auth.*, 269 F.3d 680 (6th Cir. 2001) (holding that training officer that inherited lesson plans and only adjusted those plans to incorporate newly issued procedures and protocols did not exercise discretion or independent judgment); *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 749 (6th Cir. 2000) (approving decision in *Hashop v. Rockwell Space Operations Co.*, 867 F. Supp. 1287 (S.D. Tex. 1994), in which instructors who trained Space Shuttle ground control personnel during simulated missions were not exempt because, "[a]lthough the instructors could make technical recommendations within the framework of the simulation scripts, they had no discretion to change how or when simulations were operated or to modify them in any other way").

It is unclear whether Kohl's work in appearing at community events to promote the WFD fire and life safety classes, to generate good will for the WFD, and to provide such services as bicycle registration, involved discretion or independent judgment. Although the courts have recognized that an organization's public relations or media officer can enjoy significant discretion in her work, such work generally involves a wide range of responsibility to respond to inquiries from the media and public on sensitive matters and autonomy in formulating responses, which Kohl did not have. *See, e.g., Copas v. E. Bay Mun. Utility Dist.*, 61 F. Supp. 2d, 1017, 1021–33 (N.D. Cal. 1999) (analyzing work by public affairs

representatives and media spokespersons – including a safety director charged with public relations and media communications duties – who had significant discretion in responding to questions from media and public individuals and entities); *Raper v. Iowa*, 688 N.W.2d 29 (Iowa 2004) (analyzing work by media relations officer). A limited view of Kohl's discretion would be consistent with the job description, which stated that the job required the "[a]bility to apply common sense understanding to carry out detailed but uninvolved written or oral instructions" and to "deal with problems involving a few concrete variables in standardized situations." (Docket Entry No. 22, Ex. A, Welbes Dep., at 37). A more expansive view of Kohl's discretion is supported by her own testimony as to certain aspects of her job and the fact that in her evaluation, she was charged with more responsibility for communications between the WFD and the community. (Docket Entry No. 18, Ex. A-3, at 6).

Additionally, Kohl was afforded discretion in carrying out her duties and in arranging her own work days, both in terms of what she did and when she did it. She testified that she scheduled her own appearances at different events, classes, and programs, and decided where and when she needed to be. (Docket Entry No. 22, Ex. E, Kohl Dep., at 101–04). Indeed, Kohl testified that she exercised so much autonomy over her schedule that in the last six months of her tenure, her chief criticized her frequently for not telling anyone where she was going. (*Id.* at 105). Such autonomy is a characteristic of discretion. *Lott*, 203 F.3d at 330 (holding that employee who had discretion over her work schedule "exercised autonomy and independent judgment"); *Demos v. Indianapolis*, 302 F.3d 698, 705 (7th Cir. 2002)

("Although the totality of plaintiff's duties are relevant, we may also consider the relative importance of those duties to the employer, the frequency that the employee exercises discretion, and the employee's autonomy and authority in his or her organization."); *Auer v. Robbins*, 65 F.3d 702 (8th Cir. 1995) (holding that police sergeants who were "minimally supervised, exercise[d] near unfettered discretion and enjoy[ed] a great deal of autonomy" were exempt).

In sum, the record is conflicting and inadequate to determine whether, as a matter of law, Kohl "customarily and regularly [exercised] discretion and independent judgment," as opposed to merely applying her "knowledge in following prescribed procedures or determining which procedure to follow." 29 C.F.R. § 541.207(c).

## IV.   Conclusion

For the reasons stated above, the record is inadequate to determine Kohl's exempt status. The motions for summary and partial summary judgment are denied.

Signed on July 11, 2006 at Houston, Texas.

Lee H. Rosenthal
United States District Judge